UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

HOLISTIC INDUSTRIES OF ARKANSAS,                                    PLAINTIFFS
LLC, and SAM EPSTEIN ANGEL

        vs.                    Case No. 2:20-CV-230-LTR

FEUERSTEIN KULICK LLP                                                 DEFENDANT

## REPLY TO PLAINTIFFS' RESPONSE IN OPPOSITION OF MOTION TO DISMISS, OR, ALTNERATIVELY, COMPEL ARBITRATION

Comes now, Defendant, Feuerstein Kulick LLP (the "Firm" or "Defendant" hereinafter), by and through its attorneys, Barber Law Firm, PLLC, for its Reply to Plaintiffs' Response in Opposition of Motion to Dismiss, or, Alternatively, Compel Arbitration, pursuant to the Court's Order entered on January 28, 2021, allowing the filing of a reply states as follows.

## INTRODUCTION

As set forth in Defendant's Motion to Dismiss, or, Alternatively, Compel Arbitration ("Defendant's Opening Brief"), this action arises from the Firm's preparation of a medical marijuana licenses application on behalf of Holistic Industries of Arkansas, LLC (the "Company"). As is discussed in Defendant's Opening Brief, Defendant is entitled to a dismissal of this action because (i) the Firm is not subject to personal jurisdiction in Arkansas, (ii) the Company lacks standing to sue, and (iii) Plaintiffs' Complaint fails to state facts upon which relief may be granted. In the alternative, should the Court deny Defendant's motion to dismiss in its entirety, then this matter should be referred to arbitration pursuant to the plain and unambiguous terms of the parties' engagement agreement.

In an effort to obviate these outcomes, Plaintiffs (i) rely on out-of-circuit caselaw that

1

is easily distinguishable and flatly contradicted by a litany of Eighth Circuit cases, (ii) ignore facts that are properly before this Court (such as the dissolution certificate filed with Arkansas' Secretary of State and the clear terms of the parties' engagement letter), and (iii) cite to facts set forth in an amended complaint that has not yet been approved for filing by the Court.

Even worse, if that were possible, Plaintiffs advance arguments that are logically inconsistent.  For example, in their effort to oppose the binding arbitration agreement, Plaintiffs claim that there was no binding agreement between the parties. But in the absence of the engagement letter (which is what contains the binding arbitration provision), Plaintiffs do not allege any facts that establish (or suggest) how any attorney-client relationship was formed between them and the Firm.   And in the absence of any such relationship, Plaintiffs' claims must be dismissed.   For these reasons, and the reasons discussed herein, Defendant is entitled to the relief sought in its motion.

## DISCUSSION

### I.   PERSONAL JURISDICTION

As set forth in Defendant's Opening Brief, the Firm is not subject to personal jurisdiction in Arkansas because all the work and representation in this matter occurred in New York.  (Doc. No. 14 at 8.)  The Firm never entered Arkansas and never directed any solicitation to Arkansas.  (*Id.*)  To the contrary, the Firm was solicited by Mr. Genderson, who was located in Washington D.C.  (*Id.*)

Unable to deny these facts, Plaintiffs instead rely on a single, out-of-state case captioned *Dennet v. Archuleta*, 915 F. Supp.2d 248 (D.R.I. 2013).  In that case, a Rhode Island district court exercised personal jurisdiction over a Texas law firm as a result of the law

firm's representation of a Rhode Island citizen in a personal injury case. *Id.* Specifically, the Rhode Island court noted that the underlying litigation must relate to the law firm's activity in the forum state, the law firm's contacts must represent purposeful availment, and must be reasonable. *Id.* at 251-252. The court additionally noted that the law firm agreed that its contacts with the state would "ordinarily be sufficient to establish specific personal jurisdiction." *Id.* at 252. Among the requirements of litigation, the law firm purposefully availed itself by voluntarily agreeing to communicate with witnesses in Rhode Island, engage in settlement negotiations in Rhode Island, and to file suit in Rhode Island if necessary. *Id.* at 254. Filing suit in a state would certainly include the expectation that a law firm would travel to the state and submit itself to the jurisdiction of the courts. "It was entirely foreseeable that if something were to go wrong with the representation, Defendants could be haled into court in Rhode Island." *Id.*

This case is easily distinguishable from *Dennet* because here, unlike in *Dennet*, the parties never contemplated that the Firm would have to engage in litigation on behalf of the Company in Arkansas. Rather, the terms of the engagement letter make clear that the Firm was being engaged to "represent [the Company] in connection with its application for a medical marijuana cultivation and dispensary licenses in the State of Arkansas. ***It is understood that these services will be performed by us principally in the State of New York.***" (Doc. No. 14.1 at 1.)[1]

---

[1] The terms of the engagement letter show that the parties did not contemplate any litigation taking place in Arkansas. In fact, the only litigation even contemplated in the engagement letter is the possibility of a dispute between the Firm and the Company. And in that case, the engagement letter contemplated that any resulting litigation would be in front of an arbitration panel in New York

Unlike the litigation contemplated in *Dennet*, the preparation of an application in New York did not include any expectation or possible requirement to travel to Arkansas. That is, in preparing the application, the Firm did not have any reasonable expectations of traveling to Arkansas to interview witnesses, conduct depositions, appear for hearings, submit itself to the jurisdiction of the courts, or to otherwise participate in litigation in the forum state. Instead, the Firm prepared the application in New York and established no other contact in Arkansas aside from the Company—who approached the firm to initiate the request to prepare the application. Moreover, it was the Company (not the Firm) that actually was required to physically submit the application to the Arkansas Medical Marijuana Commission (the "Commission"). **Exhibit 1, Medical Marijuana Commission Rules** See Section IV Cultivation Facility Application, Licensing, & Renewal rules of the Arkansas Medical Marijuana Commission at Sections 3, 3b, 5b, 5bii, 5c and 10a)**.** Thus, unlike the law firm in *Dennet*, the Firm had no reasonable expectation to be haled into an Arkansas court. Rather, all the Firm and the Texas law firm in *Dennet* share in common is that they are both law firms. By Plaintiffs' rationale, any lawyer doing work for a client located in a different state would subject himself/herself to the jurisdiction of the client's home state. That is plainly not the law in Arkansas or anywhere else.

For example, in *Deloney v. Chase*, 755 Fed. Appx. 592 (8th Cir. December 4, 2018),[2] the Eighth Circuit addressed an appeal from the District Court dismissing the claims against Chase based on lack of personal jurisdiction. The Deloneys, residents of Arkansas, used the

---

[2] Undersigned counsel advises the court and counsel that this case was not selected for publication in West Federal Reporter. Pursuant to Federal Rule of Appellate Procedure 32.1 undersigned counsel states that it is citing this unpublished opinion of the court which has persuasive value on material issue and no published opinion of this court or another court would serve as well.

services of Hallack, a Louisiana resident, to facilitate the transfer of funds through escrow as required by the administrative rules. *Id.* at 594. The Deloneys filed suit against Hallack in relation to the escrow account. The district court found that an Arkansas court could not exercise personal jurisdiction over Hallack because Hallack's contact with the Deloneys did not amount to the meaningful contacts or purposeful availment requirements to establish personal jurisdiction. *Id.* at 595. Hallack's actions in representing the Deloneys, accepting and managing escrow funds, and contact with the Deloneys all occurred in Louisiana. *Id.* at 597. But the Court concluded that Hallack did not direct these actions in the State of Arkansas. *Id.* at 597. As such, Hallack was not subject to personal jurisdiction in Arkansas. *Id.*; *see also Eagle Tech v. Expander Americas, Inc.*, 783 Fed.3d 1131, 1137 (8th Cir. 2015) (noting that telephone calls written communications and even wire transfers to and from the forum state do not create sufficient contacts to comport with due process such that a defendant could reasonably anticipate being hauled into court there).

Similarly, in *Porter v Berall*, 293 Fed.3d 1073 (8th Cir. 2002), the Eighth Circuit found that there was no personal jurisdiction over the out-of-state lawyer who represented the plaintiff. There, Boone Porter hired a defendant law firm located in Connecticut to represent a trust. Porter lived in Missouri at the time he initiated the legal representation—the defendant law firm did not solicit the Porter's business. *Id.* at 1075. Contact between the parties occurred through numerous phone calls and letters. *Id.* at 1076. Ported later sued the law firm in Missouri alleging legal malpractice for tax realizations in the trust. *Id.* Porter alleged that Missouri had jurisdiction because the lawyer used an appointed agent to transact business in Missouri; documents were executed in Missouri that required Porter's signature; and what the plaintiffs characterize as a solicitation of further business in

Missouri from Porter in connection with the trust. *Id.* at 1075.  The court nevertheless found that the law firm's contacts with Missouri were not substantial enough to satisfy personal jurisdiction and stated:

> the plaintiffs also cannot establish a "substantial connection" between the defendants and the forum state based on the final three factors in the analysis. The alleged negligence of the defendant in failing to inform the plaintiffs of the change in Connecticut law is not sufficiently related to an effect in Missouri to constitute a relationship between the cause of action and the context. The District Court found that "the claims about silence and failure to correct appear to be Connecticut-based". *Porter v Breall*, 142 F Sub 2nd 1145, 1148 (W.D. MO. 2001). This approach has also been adopted by the First Circuit, which "rejected the plaintiff's contention that, because the "effects" of the firm's negligence were felt in [the plaintiff's home state], the law firm had caused an injury thereby conduct directed at that forum". *Id.* at 1077.

The Eighth Circuit in *Porter* further noted that the defendants were not licensed in Missouri, they did not maintain offices in Missouri, and they did not solicit business in Missouri.  Such "actions do not show that they could have foreseen being hauled into court in Missouri based on their actions in Connecticut."  *Id.* at 1077.

Finally, in *Austad Company v. Pennie & Edmonds*, 823 Fed.2d 223 (8th Cir. 1987), a South Dakota business sued a New York law firm in South Dakota, alleging breach of fiduciary duty and professional negligence in connection with a Maryland patent litigation. *Id.* at 225.  The Eighth Circuit there found that the law firm did not have sufficient contacts with South Dakota to confer personal jurisdiction over the law firm.  *Id.* at 226.  Among other things, the Eighth Circuit noted that the law firm is not and never has been licensed to practice law in the state of South Dakota and does not maintain any business interests or bank account in South Dakota. In addition, the law firm had never advertised its services in South Dakota or solicited clients there.  *Id.*  While the firm sent a law clerk and associate to South Dakota for three (3) days to review and gather documents for the patent litigation, it

did not otherwise visit the state.  *Id.* at 225.  Other contact was limited to phone calls and

courier service between the parties.  *Id.* at 226.  In finding personal jurisdiction in South

Dakota did not exist over the law firm, the Eighth Circuit stated:

> While we do not dispute Austad's claim that an attorney-client relationship
> existed between Austad and Pennie & Edmonds, we do not believe that Pennie
> & Edmonds had sufficient contacts with South Dakota to confer personal
> jurisdiction. Pennie & Edmonds does not maintain an office in South Dakota
> nor any of its attorneys reside there or maintain a license to practice law there.
> Pennie & Edmonds has never advertised or solicited business in South Dakota.
> Further, Pennie and Edmonds did not actively seek out Austad as a client,
> rather the representation of Austad by Pennie & Edmonds was arranged
> through Richard Goldstein, president of a New York corporation which was a
> regular client of the law firm. Finally, the actions giving rise to this lawsuit took
> place in Maryland, not in South Dakota.

*Id.* at 226-227.  The court concluded that Pennie & Edmonds' only substantial connection

with South Dakota was its representation of a South Dakota Corporation in connection with

litigation taking place wholly outside South Dakota. *Id.* at 227.

Like the law firms in the aforementioned Eighth Circuit cases, the Firm cannot be

subject to personal jurisdiction in Arkansas because the Firm "does not maintain an office in

[Arkansas]," its lawyers do not "reside there or maintain a license to practice law there" and

the Firm "has never advertised or solicited business" in Arkansas. *Id.* This may have arguably

been sufficient if the Firm was pursuing a litigation on behalf of the Company.  But that was

unequivocally not what the Firm was retained to do.

When a defendant merely represents a client in a forum state and its only contact in

the forum state is with the client, the courts find that such contacts are not sufficient to

establish personal jurisdiction.  Here, the Firm prepared an application on behalf of the

Company.  There was no expectation for the Firm to travel to Arkansas or any other reason

to believe it may be haled into court in Arkansas.  As a result, under well-accepted Eighth

Circuit precedent, the Firm is not subject to personal jurisdiction in Arkansas.

## II.   STANDING

Plaintiffs do not address the Firm's arguments in its Opening Brief that Plaintiffs lack standing to sue.   Instead, to avoid an effective dismissal, Plaintiffs seek to dismiss Sam Epstein Angel voluntarily.   But this only solves half of the problem. [3]

Indeed, Plaintiffs do not address the fact that the Company has been dissolved since March 16, 2018.   **Exhibit 2, Articles of Dissolution.**   Instead, Plaintiffs curiously claim that the members changed on August 15, 2018—five (5) months after the Company's dissolution. Plaintiffs now assert they are bringing this lawsuit on behalf of a dissolved entity with authority granted to it after a change in the membership structure after its dissolution to avoid obtaining a majority vote to pursue the current litigation.   This lawsuit is an obfuscation of the requirements of the Company pursuant to the operating agreement and legal standing requirements.   The Company did not obtain legal authority to file the present lawsuit.   The Company, a dissolved entity likewise lacks authority to sue under Arkansas law. *See Charles Brooks Co. v. Georgia-Pacific, LLC*, 552 F.3d 718, 722 (8th Cir. 2009), quoting *HRR Arkansas, Inc. v. River City Contractors, Inc.*, 350A Ark. 420 (Ark. 2002).   (A corporation lacks the capacity to sue after revocation of a corporate charter because "it lacks 'the capacity to sue'" once it ceases to exist).   The Company ceased to exist on March 16, 2018, and therefore lacked capacity to sue when filing this Complaint.   Both the Company and Sam Epstein Angel should be dismissed with for prejudice for lacing standing.

---

[3] The Firm asserts that Sam Epstein Angel's dismissal should be with prejudice for the reasons stated in its motion, which are unaddressed by Plaintiffs.

### III.   FAILURE TO STATE FACTS UPON WHICH RELIEF MAY BE GRANTED

In response to the Firm's arguments that Plaintiffs' Complaint failed to satisfy pleading standards requiring dismissal pursuant to Rule 12(b)(6) of the Rules of Civil Procedure and that Defendant is entitled to judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Plaintiffs merely offer an Amended Complaint. This matter was removed on November 19, 2020, giving Plaintiffs nearly two (2) months to file an amended complaint. However, Plaintiffs chose to wait until Defendant filed a motion to dismiss to amend its complaint. But since the Amended Complaint does not – because it cannot cure the issues of personal jurisdiction, standing and or arbitrability, Defendant opposes Plaintiffs' Amended Complaint.

At best, the Amended Complaint attempts to satisfy Plaintiffs' pleading requirements by stating that the Firm failed to satisfy minimum application standards. None of these facts, however, are presently before the Court. Thus, they should not be considered unless and until the Court dismisses the original complaint.

Even considering the proposed amendments, Plaintiffs fail to describe how Defendant's actions fell below the standard of care. Only the blanket assertion remains that the Commission's rejection of the application is the proof of legal malpractice. But the fact that Plaintiffs' application was rejected and others were not is not – in and of itself – evidence that the Firm's actions fell below the standard of care. (In fact, there is no allegation whatsoever that the Firm was even engaged to perform "legal services", which is the hallmark of any legal malpractice complaint.)

Plaintiffs further fail to demonstrate how they can possibly prove damages in this case because it is impossible to know whether Plaintiffs' application would have been accepted. In the typical legal malpractice case, the fact finder is tasked with having to decide (i) the facts establishing the alleged legal malpractice, and (ii) the facts of the underlying litigation (*i.e.*, the "case within the

case").

Unlike the "case within a case", a fact-finder is not well-suited to determine whether the Company would have prevailed in the application process "but for" the Firm's alleged malpractice. Indeed, to determine whether the Company would have received a license had it been scored, Plaintiffs will have to establish that the Company's application – when scored anonymously against three-hundred (300) other applicants *at the time* the Commission members judged those applications – would have received a high enough score to receive a license.  A jury is not capable on its own of making that determination.  Nor is an expert.  Instead, Plaintiffs will have to call each of the individuals that graded the applications, provide these individuals with all of the applications they graded (including the Company's) and then ask them to re-score each application anew.[4]  Such a practice is virtually impossible, making damages far too speculative.  Rule 12(c) is, therefore, applicable at this time because the pleadings represent the available evidence in this case—speculation and blanket assertions.  While Plaintiffs assert they are entitled to elect remedies and potentially pursue fees, they still have to prove that but for the Firm's alleged negligence, the Company would have obtained a license.  As described in its motion to dismiss and herein, such proof is not possible.

## IV.   ARBITRATION

Plaintiffs do not take issue with the substance or enforceability of the arbitration agreement contained in the engagement letter.  Instead, Plaintiffs oppose the arbitration

---

[4] Plaintiffs' case is made even more difficult because they will have to overcome their own contributory negligence.  Indeed, the undisputed facts reflect that Plaintiffs approached the Firm only two weeks before the deadline.  And it was, by Plaintiffs' own admission, a ministerial mistake that cost them the opportunity to be graded.  Of course, what Plaintiffs omit is that the Commission offered applicants a period to cure ministerial mistakes had they submitted their applications with sufficient time to do so.  Given that Plaintiffs only allotted the Firm two weeks to start and complete the entire application, the Parties were deprived of this opportunity. But that is not the Firm's fault;  rather, it is Plaintiffs' fault.

agreement by disingenuously arguing that it was not a party to the engagement letter defining the legal relationship because the Company did not exist at the time of the engagement letter's execution and the Company did not sign the engagement letter.

As a practical matter, an examination of the timeline of the parties' relationship is helpful.  The Company sought the Firm's help two (2) weeks before the deadline to file the application.  This means the Firm had two (2) weeks to form a company and satisfy all of the application requirements.  Josh Genderson apprised his soon-to-be fellow members of the Company that the Firm would handle the application, and there was no objection to his retaining the Firm on behalf of the Company.  He had the authority to bind the Company, and the Company accepted the benefits of the engagement letter.  Everything had to move quickly, and the Firm and the Company quickly began its business clearly with the understanding of the engagement letter.  (If not, then the Company needs to allege facts as to how an attorney-client relationship was formed.)[5]

There are two main deficiencies with Plaintiffs' reasoning in attempting to circumvent the arbitration agreement to which it agreed.  First, the engagement letter makes clear that Mr. Genderson had "the authority to bind the entities below, ***and any affiliate created in relation to the Company's Arkansas operation, to the terms hereof.***"  (Doc. No. 14-1 at 2.)  As such, Plaintiffs are estopped from now denying the enforceability of the engagement letter.

Estoppel requires:  (1) the party seeking to avoid the contract must know the facts, (2) the party seeking to avoid the contract must act in a manner that causes the party

---

[5] Because a single Plaintiff never saw the engagement letter is not reason for a company not to be bound to an agreement signed by a principal with actual authority.

asserting estoppel has a right to believe the other party intended the contract to apply, (3) the party asserting the estoppel is not apprised of the true facts, and (4) the party asserting estoppel must rely on the other party's conduct to his injury. *Miller v. City of Lake City*, 302 Ark. 267, 270 (Ark. 1990). The party asserting estoppel—the Firm—clearly intended the engagement letter to apply and prepared the application on behalf of the Company believing the terms applied. The Company further accepted the benefits of the relationship and contract by submitting the application prepared by the Firm.

At no point did the Company object to the arbitration provision, present a new engagement letter defining the terms of their relationship, or otherwise dispute the enforceability or applicability of the engagement letter (or contest Mr. Genderson's authority to bind the Company). **Exhibit 3, Affidavit of Mitchell Kulick.**[6] The Firm had no reason to believe that the Company would claim the engagement letter and arbitration provision did not apply, and none of the actions of the Company suggested it did not agree or assent to the terms of the executed engagement letter. The Firm and the Company simply proceeded with a signed engagement letter believing its terms applied with never an indication to the contrary prior to Plaintiffs' response. Therefore, Plaintiffs are estopped from now claiming it did not have a binding agreement.

Second, Plaintiffs seek to enforce a legal relationship by pursuing a legal malpractice option, making it inherently disingenuous to simultaneously argue that no contractual relationship existed because a signature lacked or the Company had not yet been formed. To accept Plaintiffs' contention is to find that no attorney can form a company because the

---

[6] Had such a representation been made, the Firm would have had to cease work to obtain a newly executed engagement agreement.

company not yet in existence cannot be represented. Such a result is absurd and unjust.

Moreover, Plaintiffs ask this Court to find that it was ***legally*** represented by the Firm without any terms or conditions to which its principal agreed. But the nature of preparing an application does not require a law license. Indeed, compiling information and placing it on an application does not constitute the practice of law. And if there was no engagement letter setting forth the terms of the parties' relationship, then the Complaint should be dismissed with prejudice because Plaintiffs have failed to allege how any attorney-client relationship was formed. Logically, Plaintiffs' disingenuous assertion that it is not bound by the terms of the engagement letter is inconsistent with their claims and actions. Therefore, it should be dismissed, and Plaintiffs should be required to arbitrate the dispute to the extent it is not dismissed outright.

In short, the arbitration agreement and engagement letter are binding. The Company cannot claim on the one hand that the Firm committed legal malpractice in rendering legal services to the Company but claim on the other hand that the signed engagement letter by a principal of the Company is not binding. The Company never raised these concerns, and the Firm never had reason to believe the Company challenged the agreement signed by its principal. To find the engagement letter not binding would contradict contract and equitable principles. The arbitration agreement is binding, and this matter should be referred to arbitration in the event the Court does not otherwise dismiss Plaintiffs' Complaint.

## CONCLUSION

This matter should be dismissed because the Court lacks personal jurisdiction over Defendant, because Plaintiffs' failed to meet pleading standard requirements, and because Defendant is entitled to judgment on the pleadings in this case. Should the Court not dismiss

this case, then the matter should be referred to arbitration pursuant to the arbitration agreement.

Respectfully submitted,

BARBER LAW FIRM PLLC
425 W. Capitol Avenue, Suite 3400
Little Rock, AR  72201
501-372-6175
501-375-2802 = fax


By: */s/ R. Kenny McCulloch*
      R. Kenny McCulloch #88044
      D. Reece Owens #2017183
      ATTORNEYS FOR DEFENDANT
      rkmcculloch@barberlawfirm.com
      rowens@barberlawfirm.com